# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Anvik Corporation,

      Plaintiff,

      v.

IPS Alpha Technology, Ltd.,
Toshiba Corporation,
Toshiba America, Inc.,
Toshiba America Consumer Products, L.L.C.,
Matsushita Electric Industrial Co., Ltd.,
Panasonic Corporation of North America,
Hitachi, Ltd.,
Hitachi Displays, Ltd.,
Hitachi America, Ltd., and
HITACHI Electronic Devices USA, Inc.

      Defendants.

CIVIL ACTION No. _____



## 08 CIV. 4036
### COMPLAINT



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/29/08

Plaintiff Anvik Corporation ("Anvik"), by and through its undersigned counsel, for its

Complaint against the Defendants (identified below), alleges the following upon information and

belief, except as to those allegations concerning Anvik, which are alleged upon knowledge.

## SUMMARY OF THE CASE

1.      This case underscores the need to enforce U.S. patent laws to prevent companies

overseas from selling into the United States products made using technologies developed and

patented here in the United States without the patent holder's authorization.   This is a case

about major technological breakthroughs related to the manufacturing of liquid crystal display

("LCD") panels.  These innovations are the result of American ingenuity -- they were developed

here in the United States by a New York based employer, Anvik Corporation, and Anvik's founder, Dr. Kanti Jain. Dr. Kanti Jain is a world-renowned scientist and inventor. Anvik's and Dr. Jain's innovations in the area revolutionized the LCD panel industry by making it possible to mass produce high-resolution, affordable LCD displays. Before these innovations, LCD displays were used primarily for basic applications, such as in calculators. Today, high resolution LCD displays are found everywhere from cell phones to laptop computers to control panels on numerous machines to televisions of all sizes. The LCD display industry generates annual revenues of approximately *$72 billion*. The vast majority of LCD display panels sold in the U.S. are believed to be manufactured using Dr. Jain's and Anvik's patented innovations. However, Anvik and its U.S.-based employees and owners are being deprived of the revenues and other economic opportunities associated with those sales because the Defendants here (and defendants in related cases discussed below) are infringing Anvik's patents and thereby enriching themselves at Anvik's expense by hundreds of millions, if not billions, of dollars per year.

2.    The Defendants (along with certain other companies overseas) use industrial manufacturing machines produced by Nikon Corporation ("Nikon"), which improperly take advantage of Anvik's patented technologies to produce LCD displays that are then sold into the United States. Nikon is being sued by Anvik in this Court in a related action, captioned *Anvik Corp. v. Nikon Precision, Inc., et al.*, No. 05-CV-7891-SCR (S.D.N.Y.). The Defendants here (and other overseas companies which are defendants in related actions)[1] purchase from Nikon

---

1    Those related actions are captioned: *Anvik Corp. v. AFPD PTE Ltd.*, No. 07-CV-828-SCR (S.D.N.Y.); *Anvik Corp. v. AU Optronics Corp., et al.*, No. 07-CV-822-SCR (S.D.N.Y.); *Anvik Corp. v. Chi Mei Optoelectronics, et al.*, No. 07-CV-821-SCR (S.D.N.Y.); *Anvik Corp. v. Chunghwa Picture Tubes Ltd., et al.*, No. 07-CV-820-SCR (S.D.N.Y.); *Anvik Corp. v. HannStar Display Corp.*, No. 07-CV-827-SCR (S.D.N.Y.); *Anvik Corp. v. Innolux Display Corp.*, No. 07-CV-826-SCR (S.D.N.Y.); *Anvik Corp. v. LG. Philips LCD Co., Ltd., et al.*, No. 07-CV-816-SCR

and use machines that manufacture LCD displays using processes which infringe Anvik's patents. Defendants sell those LCD displays, directly and through intermediaries, into the United States market, including New York. Despite the fact that a U.S. company (Anvik) developed the technology which these Defendants and others overseas use to sell enormous volumes of LCD displays into the United States, Anvik and its employees and owners here in the U.S. are realizing none of the benefits of those sales – because of Defendants' (and other overseas companies') knowing violation of U.S. patent laws and their willful infringement of Anvik's patents.

3.    Anvik is a small company based in Hawthorne, New York. Anvik has been an employer in the region for several years. Dr. Jain is Anvik's founder and President. Dr. Jain is recognized as a leader in the field of microlithography, the process of "writing" intricate patterns on materials to manufacture complex electronic devices. Nikon itself has described Dr. Jain as "a famous pioneer," and Nikon previously tried (unsuccessfully) to retain him as an expert in the field. Dr. Jain's advancements in the manufacturing of LCD flat panel displays are embodied in Anvik's patents.

4.    Discovery in the ongoing litigation against Nikon has already confirmed many of the facts showing infringement by Nikon and the other companies that use Nikon's machines to manufacture LCD displays (including the Defendants here).

5.    U.S. Patent No. 4,924,257 (the "'257 patent") is the earliest-issued patent at issue in this case. The '257 patent was issued by the United States Patent and Trademark Office in 1990. Shortly thereafter, in September 1990, Dr. Jain (through an intermediary) wrote Nikon and

---

(S.D.N.Y.); *Anvik Corp. v. Samsung Electronics Co., Ltd., et al.*, No. 07-CV-818-SCR (S.D.N.Y.); *Anvik Corp. v. Sharp Corp., et al.*, No. 07-CV-825-SCR (S.D.N.Y.); and *Anvik*

offered to negotiate a licensing arrangement that would have given Nikon, for a fair fee, the right

to use the innovations developed by Dr. Jain in the area of microlithography embodied in the

'257 patent. Nikon quickly realized that the innovations embodied in the '257 patent represented

major breakthroughs. Despite the fact that Nikon employs several hundred engineers with

essentially limitless resources at their disposal, Nikon had not been able on its own to develop

innovations such as those embodied in Anvik's '257 patent. Immediately after learning of

Anvik's '257 patent, well over a dozen of Nikon's top engineers and high-level managers

(including Nikon's Managing Director at the time, Shoichiro Yoshida, who would go on to serve

as Nikon's Chairman and CEO from 2001 to 2005) were involved in reviewing the inventions

described in the '257 patent. In other words, news of the breakthroughs embodied in Anvik's

'257 patent reached the highest levels of Nikon. At that point, since Nikon had been unable on

its own to develop the type of innovations embodied in the '257 patent, Nikon had a choice.

Nikon could either: (1) negotiate with Anvik in an up front manner and pay a fair licensing fee

to use the technology in the '257 patent, or (2) Nikon could secretly use Anvik's patented

technology and hope that Nikon (and others benefiting from the infringement of Anvik's patents,

including the Defendants here) would not get caught doing so. Nikon opted for the second

choice. In fact, rather than discussing a license agreement with Anvik, Nikon did not respond to

Dr. Jain's letter at all.

      6.      Instead, Nikon studied Anvik's patented technology and designed LCD panel

manufacturing machines based on that technology without Anvik's knowledge or permission.

Nikon kept these facts from the public at large, and Anvik had no way of knowing that Nikon

was infringing Anvik's patents until years later when Nikon put a paper written in 2004 on its

*Corp. v. Toppan Printing Co. Ltd., et al.,* No. 07-CV-824-SCR (S.D.N.Y.).

website (which Nikon abruptly took off its website shortly thereafter) indicating that Nikon was

effectively making use of the technology developed by Dr. Jain and patented by Anvik.  Nikon's

unauthorized use of Anvik's patented technologies helped propel Nikon from a company that had

been unable on its own to develop the types of technologies identified in Anvik's patents, to the

dominant worldwide supplier of LCD manufacturing machines.  As Nikon boasts in its 2007

Annual Report: "…[F]or larger screen sizes in LCD televisions. *We have monopolized the*

*market in these sectors.*"  (Emphasis added.)  In other words, Nikon is a self-described

monopolist in this area.  It is now known that a cornerstone of the Nikon Empire is the

technology that Nikon misappropriated from Anvik.  Nikon's infringing LCD manufacturing

machines are now responsible for producing many if not all of the larger sized LCD televisions,

and they also are responsible for producing most of the other LCD panels sold in the United

States – and those billions of dollars (per year) of LCD panels are manufactured using technology

developed and patented by Anvik.

       7.      After Anvik approached Nikon about its infringement of Anvik's patents and

Nikon was unable or unwilling to provide a sufficient explanation, Anvik initiated litigation

against Nikon in this Court.  But, Nikon is not alone in its infringement of Anvik's patents.  The

companies that purchase from Nikon LCD panel manufacturing machines (all of which are based

in East Asia) and use those machines to sell LCD panels into the United States are infringing

Anvik's patents as well.  Discovery from Nikon identified those companies, and Anvik initiated

litigation against those parties in this Court in January 2007.  They include: Sharp (based in

Japan), Samsung (based in Korea), LG Phillips (based in Korea), AU Optronics (based in

Taiwan), AFPD (based in Singapore), and others – all of which manufacture LCD panels

overseas.  Although IPS Alpha Technology, Ltd. ("IPS Alpha") began purchasing and using

infringing machines from Nikon some time ago, it was not until recently that Nikon finally disclosed this fact to Anvik, thereby precipitating this lawsuit.

8.    As outlined in this complaint and as will be shown at trial, these Defendants (and other defendants sued by Anvik in related actions) have reaped billions of dollars from their willful infringement of Anvik's patents.  Indeed, it is understood that these Defendants and the others sued by Anvik regularly tout to their fellow citizens in Japan, Taiwan, Korea, and Singapore the importance to those economies of the revenues from their sales of LCD panels in the U.S. – which would not be possible without their unauthorized use of Anvik's patented technology.  This case seeks to hold Defendants fully accountable for their violations of U.S. patent laws and for the harm and lost opportunities suffered by Anvik as a result of the ongoing infringement of its patents.

**Nature of the Action**

9.    This is an action for patent infringement under the patent laws of the United States, 35 U.S.C. § 1 *et. seq.*  This action concerns Defendants' ongoing violations of U.S. patent laws by knowingly using machines that infringe Anvik's patents, and importing and selling into the United States flat-panel displays made using Anvik's patented technologies.

10.    The patents-in-suit in this action relate to microlithography systems and the methods performed by such systems.  Microlithography systems are critical in the production of a variety of microelectronic devices, including flat-panel displays, semiconductor integrated circuit chips, and other high-performance electronic products.  As an example, microlithography systems and the methods performed thereby are used by many of the world's largest electronics manufacturers to make thin-film transistor LCD panels that are incorporated into and have revolutionized televisions, computer monitors, cellular phones, video recorders and the like.

6

**Anvik and Its Founder, Dr. Kanti Jain**

11.     Anvik, the owner of the patents-in-suit, is a company based in Westchester

County, New York that designs, develops, and manufactures sophisticated microlithography

systems for a variety of customers, including universities, private companies and the United

States government, including the Department of Defense. Anvik's patented microlithography

methods and systems are based on several significant breakthroughs Anvik has made in optical

systems, lithography, and microelectronics process technologies. These innovations have

enabled Anvik's patented systems to achieve the high throughput levels and low costs demanded

by the microelectronics, optoelectronics, and microsystems industries.

12.     Anvik's President and founder, Dr. Kanti Jain, is a named inventor on each of the

patents-in-suit. He is also Professor of Electrical and Computer Engineering and Director of the

Photonics, Microelectronics, and Microsystems Laboratory at the University of Illinois at

Urbana-Champaign. As a result of his more than 30 years of contributions in the advancement of

optical imaging and microelectronics manufacturing technologies, Dr. Jain is an internationally

recognized scientist and technologist. He is widely recognized for his pioneering development of

excimer laser lithography, for which he received two Outstanding Innovation Awards from

I.B.M., and which is now used worldwide in semiconductor chip and flat-panel display

manufacturing.

13.     In 2008, the Optical Society of America ("OSA") awarded Dr. Jain the prestigious

David Richardson Medal for achievements in the field of optical engineering. This award

recognizes a small handful of individuals who have had significant influence primarily in the

commercial and industrial sector of optical engineering. As described by OSA, Dr. Jain was

honored for his pioneering contributions to the development of high-resolution optical

microlithography technologies, particularly for the invention and development of excimer laser lithography technologies and systems for production of microelectronic devices.

14.    Dr. Jain holds 53 issued patents in microlithography systems and optics, has applications for 11 additional patents pending, has published 55 papers, and has written the book *Excimer Laser Lithography*, published by the International Society for Optical Engineering ("SPIE") in 1990. He is a Fellow of the OSA, a Fellow of the Institute of Electrical and Electronics Engineers, and a Fellow and former Member of the Board of Directors and Executive Committee of SPIE.

**Defendants and Their Use of Nikon FX-Series Microlithography Machines**

15.    IPS Alpha was established as a joint venture of Toshiba Corporation ("Toshiba"), Matsushita Electric Industrial Co., Ltd. ("Matsushita"), Hitachi Displays, Ltd. ("Hitachi Displays"), and other investors on January 1, 2005. As of March 31, 2008, IPS Alpha was owned 50% by Hitachi Displays, 45% by Matsushita, and 5% by other investors. Matsushita, which is best known for its Panasonic brand electronics products, has announced that it intends to acquire some or all of Hitachi's stake in IPS Alpha, which is expected to make Matsushita the majority owner of IPS Alpha.

16.    IPS Alpha produces thin film transistor LCD panels for LCD televisions with wider viewing angles (178 degrees) and higher resolution than televisions with non-IPS LCD panels. IPS Alpha's LCD panels are sold under the brand name "IPSα panels." IPS Alpha manufactures many or all of these LCD panels with Nikon machines using Anvik's patented technologies.

17.    IPS Alpha started mass production of LCD panels in or about May 2006, producing 1.6 million units per year, in terms of 32-inch units. IPS Alpha increased its production to 2.5 million units per year, in terms of 32-inch units, in or about April 2007.

18.    IPS Alpha sells its LCD panels into the United States through established distribution channels as components of televisions sold by third parties, including its owners Toshiba, Matsushita, and Hitachi. Each of Toshiba, Matsushita, and Hitachi, with IPS Alpha's knowledge, sells LCD panels purchased from IPS Alpha directly into the United States (including New York) as components in televisions sold under their own brand names.

19.    The ability of IPS Alpha, Toshiba, Matsushita, and Hitachi to meet the growing demand for LCD televisions and other products incorporating LCD panels is due in large part to their misappropriation of Anvik's patented technologies. IPS Alpha manufactures many or all of its LCD panels using methods performed by microlithography systems manufactured by Nikon. Those Nikon microlithography machines are designated by Nikon as FX-Series machines. The methods performed by IPS Alpha using those FX-Series machines violate Anvik's patents-in-suit. Neither IPS Alpha nor Nikon (nor any of the other Defendants) is authorized to use the technology covered by Anvik's patents. Accordingly, Defendants' importation and sale into the U.S. of LCD panels manufactured using methods performed by the Nikon FX-Series machines is an ongoing violation of Anvik's patents-in-suit. IPS Alpha is importing and selling into the United States -- indirectly through intermediaries including Toshiba, Matsushita, and Hitachi -- LCD panels generating hundreds of millions of dollars annually, or more, in violation of Anvik's patents-in-suit.

**Defendants' Willful Infringement of Anvik's Patents**

20.    On information and belief, Nikon has had discussions with users of FX-Series

machines, including IPS Alpha, regarding the '257 patent, this litigation, the lack of any opinion

of counsel that the FX-Series machines do not infringe the Anvik patents, and the parties'

significant exposure to Anvik for patent infringement.  The importation and sale into the United

States by IPS Alpha's own customers, including Toshiba, Matsushita, and Hitachi, of products

which incorporate LCD panels purchased from IPS Alpha and which are manufactured using

Anvik's patented methods is an ongoing violation of Anvik's patents-in-suit.  IPS Alpha works

in concert with its customers to import and sell into the United States infringing LCD panels

(and/or products incorporating infringing LCD panels).  IPS Alpha has knowledge of Anvik's

patents, IPS Alpha practices Anvik's patented methods in violation of U.S. patent laws, and IPS

Alpha possesses a specific intent to encourage the further infringement of Anvik's patents by IPS

Alpha's customers.  Toshiba, Matsushita, and Hitachi also have knowledge of Anvik's patents

and possess a specific intent to infringe those patents.

21.    Although IPS Alpha itself produces a large volume of LCD panels for use in its

customers' televisions, IPS Alpha is unable to produce as many LCD panels as its customers

need for their televisions and other products incorporating such displays.  Toshiba, Matsushita,

and Hitachi therefore buy large quantities of LCD panels manufactured using Nikon FX

machines by other manufacturers.  For example, Toshiba and Matsushita buy such LCD panels

from LG Display (formerly known as LG.Philips LCD Co.) and HannStar Display Corp.;

Toshiba buys such LCD panels from Chunghwa Picture Tubes, Ltd.; Matsushita buys such LCD

panels from Samsung Electronics Co.; and Hitachi buys such LCD panels from HannStar Display

Corp.  Toshiba, Matsushita, and Hitachi incorporate these LCD panels into their televisions and

other products that they import and/or sell into the United States. LG Display, HannStar Display

Corp., Chunghwa Picture Tubes, Ltd., and Samsung Electronics Co. all use Nikon FX-Series

machines and the methods performed by these Nikon machines to manufacture LCD panels that

they sell to Defendants. None of these entities is authorized to use the technologies covered by

Anvik's patents-in-suit. The importation and sale into the United States by Toshiba, Matsushita,

and Hitachi of their products incorporating these LCD panels bought by them from other

manufacturers violate U.S. patent laws and infringe the patents-in-suit.

22.    As a result of IPS Alpha's, Toshiba's, Matsushita's, and Hitachi's infringement of

Anvik's patents, Anvik's business has been irreparably damaged and is being harmed on a

continuing basis due to the opportunities, revenues and jobs lost by this Westchester county, New

York-based company, for the benefit of companies like Defendants and Nikon, in violation of

U.S. patent laws. Anvik has suffered damages in the hundreds of millions, if not billions, of

dollars.

23.    As a tactic to try to distract attention from Nikon's misconduct and the

misconduct of others (including the Defendants here) who profit by using the Nikon LCD panel

manufacturing machines in violation of Anvik's patents, Nikon recently filed with the U.S.

Patent and Trademark Office an application asking that the Patent Office re-examine its original

determination in 1990 to issue the '257 patent to Dr. Jain. As discussed above, Nikon learned

about the '257 patent in September 1990 almost immediately after it was issued, and Nikon

engineers and managers at the highest levels of the company studied it and decided to make

unauthorized use of the technology. Nikon showed no hesitation about misappropriating the

technology embodied in Anvik's patents, and Nikon has relied on Anvik's patented technologies

to become the dominant supplier of LCD panel manufacturing machines worldwide and a self-

proclaimed monopolist in the marketplace. But, Nikon waited *17 years* before asking the Patent and Trademark Office to re-examine its decision in 1990 to issue the '257 patent to Dr. Jain, and Nikon did so only after it found itself on the run in litigation pending against it in this Court. Testimony in that case by high ranking Nikon personnel shows that Nikon's re-examination application to the Patent and Trademark Office is based on misplaced assertions of invalidity that could have been raised by Nikon just as easily 17 years ago – i.e, before Nikon decided to infringe Anvik's patents and make enormous sums of money doing so – if Nikon had sincerely believed in those assertions of invalidity. Nikon has never argued that its re-examination application should serve as a basis for delaying Anvik's suits against Nikon and the users of Nikon's LCD manufacturing machines (such as the Defendants here), nor would Nikon or any party have a basis for doing so.

## THE PARTIES

24.     Anvik is a New York corporation with its principal place of business at 6 Skyline Drive, Hawthorne, NY 10532.

25.     IPS Alpha is a Japanese corporation headquartered at Mobara City, Chiba Prefecture, Japan.

26.     Toshiba is a Japanese corporation headquartered in Tokyo, Japan. Toshiba had net sales of $60 billion in the year ended March 31, 2007.

27.     Toshiba America, Inc. ("Toshiba America") is a wholly owned subsidiary of Toshiba and is the holding company for Toshiba's businesses in the United States. Toshiba America is headquartered at 1251 Avenue of the Americas, New York, NY 10020.

28.     Toshiba America Consumer Products, L.L.C. ("Toshiba America Consumer Products") is a subsidiary of Toshiba America and is headquartered in Wayne, NJ.

12

29.    Hitachi, Ltd. ("Hitachi"), a Japanese corporation, is a global electronics company headquartered in Tokyo, Japan. Hitachi had consolidated revenues of $86.8 billion in the year ended March 31, 2007.

30.    Hitachi Display, a Japanese corporation located in Mobara City, Chiba Prefecture, Japan, was a wholly owned subsidiary of Hitachi until March 31, 2008. On February 15, 2008, Hitachi and Matsushita announced that Matsushita would acquire 24.9% of Hitachi Display on March 31, 2008, subject to regulatory approval.

31.    Hitachi America, Ltd. ("Hitachi America"), a wholly owned subsidiary of Hitachi, markets and manufactures electronics and consumer electronics products throughout North America. Hitachi America maintains an office at 50 Prospect Avenue, Tarrytown, NY 10591 and a New York sales office at 597 Fifth Avenue, New York, NY 10017.

32.    HITACHI Electronic Devices USA, Inc. ("Hitachi Electronic Devices USA"), a wholly owned subsidiary of Hitachi, is responsible for all North and South American sales for liquid crystal displays produced by Hitachi Display.

33.    Matsushita, a Japanese corporation, is a worldwide electronics manufacturer and is based in Osaka, Japan.

34.    Panasonic Corporation of North America ("Panasonic North America"), a wholly owned subsidiary of Matsushita, is headquartered in Secaucus, NJ.

## JURISDICTION AND VENUE

35.    This Court has jurisdiction over the subject matter of the claims asserted herein pursuant to 28 U.S.C. §§ 1331 and 1338.

36.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the events giving rise to the claims occurred in this district and

Defendants are subject to personal jurisdiction in this district. Venue is also proper in this judicial district under 28 U.S.C. § 1400(b).

**Jurisdictional Allegations Regarding IPS Alpha**

37.    IPS Alpha, through intermediaries including Toshiba, Matsushita, and Hitachi and their affiliates named as Defendants herein and their other wholesale and retail distributors, is doing business within this State and judicial district, transacts business within this State and judicial district, derives substantial revenue from intra-state and inter-state commerce, has committed acts of patent infringement within this State and judicial district, and is otherwise within the jurisdiction of this Court. IPS Alpha manufactures LCD panels in Japan and directs those products to the United States, including this judicial district, through established distribution channels involving its owners and third parties, knowing that these owners and third parties will use their respective nationwide contacts and distribution channels to import into, sell, offer for sale and/or use these products in this judicial district and throughout the United States.

38.    An IPS Alpha press release dated April 23, 2007 states: "IPS Alpha distributes panels produced using [IPS] technology as 'IPSα Panels' worldwide." A February 15, 2008 IPS Alpha press release states that the switch to digital broadcasting in the United States is leading to increased demand for LCD televisions; that IPS Alpha panels are "at the center" of demand for replacement televisions in the U.S. market; and that IPS Alpha "provides [IPSα Panels] all over the world." A message from IPS Alpha's President featured on IPS Alpha's web site as of April, 2008 states: "We will timely provide globally more competitive large LCD panels for TVs realized by the world-leading IPS mode system technology and coordination with . . . equipment makers through the total supply chain built by close collaboration with TV set makers . . . and other companies concerned."

14

39.    A joint Hitachi, Toshiba, and Matsushita press release dated October 29, 2004, which announced their agreement to form IPS Alpha, stated: "Close collaboration with IPS Alpha is expected to achieve synergies in the production of finished products at Hitachi, Toshiba, and Matsushita, allowing them to achieve LCD TVs that are even more competitive in terms of performance and price." An IPS Alpha press release dated January 23, 2006 stated: "Hitachi, Toshiba, Matsushita and IPS Alpha Technology, as set and panel makers, will work closely together to achieve synergy in the supply of IPS LCD panels and televisions that are more competitive in terms of both performance and price."

**Jurisdictional Allegations Regarding Toshiba**

40.    Toshiba, through intermediaries including Toshiba America Consumer Products and third-party wholesale and retail distributors, is doing business within this State and judicial district, transacts business within this State and judicial district, derives substantial revenue from intra-state and inter-state commerce, has committed acts of patent infringement within this State and judicial district, and is otherwise within the jurisdiction of this Court. Toshiba America Consumer Products sells televisions containing Toshiba's "Cinespeed" brand LCD panels throughout the United States, including in New York State and this District. "Cinespeed" is believed to be Toshiba's trademark for IPS Alpha LCD panels. Toshiba also buys LCD panels manufactured using Nikon FX machines from LG Display, HannStar Display Corp., and Chunghwa Picture Tubes, Ltd., and incorporates these LCD panels into its televisions and other products that it imports and/or sells into the United States.

**Jurisdictional Allegations Regarding Matsushita**

41.    Matsushita, through intermediaries including Panasonic North America and third-party wholesale and retail distributors, is doing business within this State and judicial district,

transacts business with this State and judicial district, derives substantial revenue from intra-state and inter-state commerce, has committed acts of patent infringement within this State and judicial district, and is otherwise within the jurisdiction of this Court. Panasonic North America sells televisions containing IPS Alpha LCD panels throughout the United States, including New York State and this District. For example, Panasonic sells its model TC-37LZ85 37-inch widescreen VIERA brand LCD 1080p (pixels per inch) HDTV, which includes an IPS Alpha 1080p (WSXGA) panel, to retailers in this District, including P.C. Richard & Son stores in Manhattan, the Bronx, and Yonkers. Panasonic North America's web site directs customers to authorized service centers for this and other models of Panasonic televisions in this District, including Advisory TV in New York, NY and Nu-Sonic Radio in Hartsdale, NY. Panasonic North America also sells LCD televisions containing IPS Alpha panels through its PanasonicDirect web site, which is registered to do business in New York State and collects New York State sales tax on shipments to customers in this District.

42. Matsushita's annual report on Form 20-F for the year ended March 31, 2007 stated: "For LCD TVs with screen sizes of 26- to 32-inches, the Company jointly established IPS Alpha Technology, Ltd. with Hitachi Displays, Ltd. and Toshiba in January 2005 and began mass production in May 2006 aiming to secure a stable supply of high-quality LCD panels for TVs. In fiscal 2007, LCD TV products which feature IPS technology to realize vivid color even from a wide angle have been well received in markets worldwide due to their high picture quality and performance."

43. A joint press release dated December 25, 2007 by Matsushita, Hitachi, and Canon, Inc., which announced among other things that Matsushita intended to increase its ownership interest in IPS Alpha to a majority stake, stated: "Matsushita is moving aggressively ahead with

the enhancement of a vertically integrated business in the flat-panel TV sector. . . . [Matsushita]

believes that by meticulously responding to diversifying customer wants and needs, it can be the

primary force driving the flat-panel TV market worldwide."

      44.    Matsushita's stock is listed on the New York Stock Exchange.

**Jurisdictional Allegations Regarding Hitachi**

      45.    Hitachi, through intermediaries including Hitachi Displays, Hitachi America, and

HITACHI Electronic Devices USA and third-party wholesale and retail distributors, is doing

business within this State and judicial district, transacts business with this State and judicial

district, derives substantial revenue from intra-state and inter-state commerce, has committed

acts of patent infringement within this State and judicial district, and is otherwise within the

jurisdiction of this Court.  Hitachi markets Hitachi brand LCD televisions containing IPS Alpha

LCD panels through a distribution chain which includes Hitachi Displays, Hitachi America, and

HITACHI Electronic Devices USA.  The eastern region sales office of HITACHI Electronic

Devices USA, located in Lawrenceville, GA, sells such LCD televisions to retail stores in New

York State, including this District, directly and through distributors, including Technology Sales,

Inc. in Fairport and Syracuse, NY, and Strategic Sales, Inc. in Fairfield, NJ. Those distributors

are identified on HITACHI Electronic Devices USA's web site as of April 2008, and the web site

states: "[Q:]  What channels does HED(US) use to sell its products?  [A:]  HED(US) sells its

LCD panels through both direct and distribution sales channels. Authorized sales reps in your

state will help you to find the best way to receive Hitachi's panels. You can obtain a list of sales

representatives and distributors in your local area on this website."

      46.    A Hitachi press release dated February 5, 2008 stated:

Hitachi is implementing a sales strategy to meet the needs of consumers who demand high-end products. Its efforts are based around channels, both in Japan and overseas, that specialize in sales of high-end products. At the same time, Hitachi is working to improve and enhance its sales network in priority overseas market.

\* \* \*

In North America, Hitachi is strengthening partnerships with its regional retail customer base and stores that specialize in high-end audio/visual equipment. . . . The focus in North America and Europe respectively will allow each region to implement streamlined sales organizations. Finally, Hitachi is prioritizing investments to the sales channel during this time of improving efficiencies to the sales organization. At the same time, the Company is working to reduce logistical costs by improving total supply chain management (TSCM).

47.    Hitachi's stock is listed on the New York Stock Exchange.

## COUNT I - Infringement of U.S. Patent No. 4,924,257

48.    Anvik repeats and realleges the allegations set forth above.

49.    This claim arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et. seq.*, including 35 U.S.C. § 271, and is for willful patent infringement.

50.    United States Patent No. 4,924,257 ("the '257 patent"), entitled "Scan and Repeat High Resolution Projection Lithography System," was duly and legally issued by the United States Patent and Trademark Office on May 8, 1990.

51.    Anvik is the assignee of all rights, title, and interest in and to the '257 patent and possesses all rights of recovery under the '257 patent.

52.    Through their conduct discussed above, directly and/or through intermediaries, Defendants have infringed and are continuing to infringe the '257 patent in violation of 35 U.S.C. § 271, including but not limited to, 35 U.S.C. § 271(g).

53.    Through their conduct discussed above, Defendants have also contributed to the infringement of the '257 patent, and/or induced others to infringe the '257 patent, in violation of 35 U.S.C. §§ 271(b) and/or (c).

18

54.    As a direct and proximate result of Defendants' acts of infringement, Anvik has suffered damages and is entitled to recover an amount adequate to compensate for the infringement under 35 U.S.C. § 284, which amount is to be determined at trial.

55.    Defendants have had, at all relevant times, actual and constructive notice that their conduct infringed on the claims of the '257 patent but nevertheless continued their infringing conduct.  Defendants' infringement has been, and continues to be, willful and, therefore, Anvik is entitled to treble damages under 35 U.S.C. § 284.

56.    This is an exceptional case under 35 U.S.C. § 285 which entitles Anvik to an award of reasonable attorneys' fees.

57.    Defendants will continue infringing the '257 patent, causing irreparable harm for which there is no adequate remedy at law, unless enjoined from further infringement by this Court.

### COUNT II - Infringement of U.S. Patent No. 5,285,236

58.    Anvik repeats and re-alleges the allegations set forth above.

59.    This claim arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et. seq.*, including 35 U.S.C. § 271, and is for willful patent infringement.

60.    United States Patent No. 5,285,236 ("the '236 patent"), entitled "Large-Area, High-Throughput, High-Resolution Projection Imaging System," was duly and legally issued by the United States Patent and Trademark Office on February 8, 1994.

61.    Anvik is the assignee of all rights, title, and interest in and to the '236 patent and possesses all rights of recovery under the '236 patent.

62.     Through their conduct discussed above, directly and/or through intermediaries, Defendants have infringed and are continuing to infringe the '236 patent in violation of 35 U.S.C. § 271, including but not limited to, 35 U.S.C. § 271(g).

63.     Through their conduct discussed above, Defendants have also contributed to the infringement of the '236 patent, and/or induced others to infringe the '236 patent, in violation of 35 U.S.C. §§ 271(b) and/or (c).

64.     As a direct and proximate result of Defendants' acts of infringement, Anvik has suffered damages and is entitled to recover an amount adequate to compensate for the infringement under 35 U.S.C. § 284, which amount is to be determined at trial.

65.     Defendants have had, at all relevant times, actual and constructive notice that their conduct infringed on the claims of the '236 patent but nevertheless continued their infringing conduct.  Defendants' infringement has been, and continues to be, willful and, therefore, Anvik is entitled to treble damages under 35 U.S.C. § 284.

66.     This is an exceptional case under 35 U.S.C. § 285 which entitles Anvik to an award of reasonable attorneys' fees.

67.     Defendants will continue infringing the '236 patent, causing irreparable harm for which there is no adequate remedy at law, unless enjoined from further infringement by this Court.

## COUNT III - Infringement of U.S. Patent No. 5,291,240

68.     Anvik repeats and re-alleges the allegations set forth above.

69.     This claim arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et. seq.*, including 35 U.S.C. § 271, and is for willful patent infringement.

70.    United States Patent No. 5,291,240 ("the '240 patent"), entitled "Nonlinearity-Compensated Large-Area Patterning System," was duly and legally issued by the United States Patent and Trademark Office on March 1, 1994.

71.    Anvik is the assignee of all rights, title, and interest in and to the '240 patent and possesses all rights of recovery under the '240 patent.

72.    Through their conduct discussed above, directly and/or through intermediaries, Defendants have infringed and are continuing to infringe the '240 patent in violation of 35 U.S.C. § 271, including but not limited to, 35 U.S.C. § 271(g).

73.    Through their conduct discussed above, Defendants have also contributed to the infringement of the '240 patent, and/or induced others to infringe the '240 patent, in violation of 35 U.S.C. §§ 271(b) and/or (c).

74.    As a direct and proximate result of Defendants' acts of infringement, Anvik has suffered damages and is entitled to recover an amount adequate to compensate for the infringement under 35 U.S.C. § 284, which amount is to be determined at trial.

75.    Defendants have had, at all relevant times, actual and constructive notice that their conduct infringed on the claims of the '240 patent but nevertheless continued their infringing conduct.  Defendants' infringement has been, and continues to be, willful and, therefore, Anvik is entitled to treble damages under 35 U.S.C. § 284.

76.    This is an exceptional case under 35 U.S.C. § 285 which entitles Anvik to an award of reasonable attorneys' fees.

77.    Defendants will continue infringing the '240 patent, causing irreparable harm for which there is no adequate remedy at law, unless enjoined from further infringement by this Court.

## COUNT IV - Infringement of U.S. Patent No. 5,721,606

78.     Anvik repeats and re-alleges the allegations set forth above.

79.     This claim arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et. seq.*, including 35 U.S.C. § 271, and is for willful patent infringement.

80.     United States Patent No. 5,721,606 ("the '606 patent"), entitled "Large-Area, High-Throughput, High-Resolution, Scan-and-Repeat, Projection Patterning System Employing Sub-Full Mask," was duly and legally issued by the United States Patent and Trademark Office on February 24, 1998.

81.     Anvik is the assignee of all rights, title, and interest in and to the '606 patent and possesses all rights of recovery under the '606 patent.

82.     Through their conduct discussed above, directly and/or through intermediaries, Defendants have infringed and are continuing to infringe the '606 patent in violation of 35 U.S.C. § 271, including but not limited to, 35 U.S.C. § 271(g).

83.     Through their conduct discussed above, Defendants have also contributed to the infringement of the '606 patent, and/or induced others to infringe the '606 patent, in violation of 35 U.S.C. §§ 271(b) and/or (c).

84.     As a direct and proximate result of Defendants' acts of infringement, Anvik has suffered damages and is entitled to recover an amount adequate to compensate for the infringement under 35 U.S.C. § 284, which amount is to be determined at trial.

85.     Defendants have had, at all relevant times, actual and constructive notice that their conduct infringed on the claims of the '606 patent but nevertheless continued their infringing conduct.  Defendants' infringement has been, and continues to be, willful and, therefore, Anvik is entitled to treble damages under 35 U.S.C. § 284.

86.    This is an exceptional case under 35 U.S.C. § 285 which entitles Anvik to an award of reasonable attorneys' fees.

87.    Defendants will continue infringing the '606 patent, causing irreparable harm for which there is no adequate remedy at law, unless enjoined from further infringement by this Court.

## COUNT V - Infringement of U.S. Patent No. 5,897,986

88.    Anvik repeats and re-alleges the allegations set forth above.

89.    This claim arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et. seq.*, including 35 U.S.C. § 271, and is for willful patent infringement.

90.    United States Patent No. 5,897,986 ("the '986 patent"), entitled "Projection Patterning of Large Substrates Using Limited-Travel X-Y Stage," was duly and legally issued by the United States Patent and Trademark Office on April 27, 1999.

91.    Anvik is the assignee of all rights, title, and interest in and to the '986 patent and possesses all rights of recovery under the '986 patent.

92.    Through their conduct discussed above, directly and/or through intermediaries, Defendants have infringed and are continuing to infringe the '986 patent in violation of 35 U.S.C. § 271, including but not limited to, 35 U.S.C. § 271(g).

93.    Through their conduct discussed above, Defendants have also contributed to the infringement of the '986 patent, and/or induced others to infringe the '986 patent, in violation of 35 U.S.C. §§ 271(b) and/or (c).

94.    As a direct and proximate result of Defendants' acts of infringement, Anvik has suffered damages and is entitled to recover an amount adequate to compensate for the infringement under 35 U.S.C. § 284, which amount is to be determined at trial.

95.    Defendants have had, at all relevant times, actual and constructive notice that their conduct infringed on the claims of the '986 patent but nevertheless continued their infringing conduct. Defendants' infringement has been, and continues to be, willful and, therefore, Anvik is entitled to treble damages under 35 U.S.C. § 284.

96.    This is an exceptional case under 35 U.S.C. § 285 which entitles Anvik to an award of reasonable attorneys' fees.

97.    Defendants will continue infringing the '986 patent, causing irreparable harm for which there is no adequate remedy at law, unless enjoined from further infringement by this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Anvik prays for judgment and relief as follows:

A.    A judgment that Defendants have infringed and continue to infringe claims of the '257, '236, '240, '606 and '986 patents;

B.    An order, pursuant to 35 U.S.C. § 283, permanently enjoining and restraining Defendants and their officers, directors, principals, agents, servants, employees, successors and assigns, and all those in active concert or participation with each of the foregoing, from infringing – and from contributing to and/or inducing the infringement of – any claims of the '257, '236, '240, '606 and '986 patents;

C.    An order, pursuant to 35 U.S.C. § 284, that Defendants account to Anvik for an amount adequate to compensate Anvik for damages sustained from Defendants' infringing acts, which amount is to be determined, and that said amount be trebled pursuant to 35 U.S.C. § 284;

D.    An order, pursuant to 35 U.S.C. § 285, that Defendants pay Anvik its reasonable attorneys' fees in connection with this action;

E.    A judgment that costs of this action be awarded to Anvik;

F.    An order that Defendants pay Anvik prejudgment and post-judgment interest at the highest statutory rate on Anvik's damages, costs and attorneys' fees; and

G.    An order awarding Anvik such other and further relief as may be deemed by this Court to be just and proper.

## JURY DEMAND

Anvik hereby demands trial by jury on all issues so triable.

Date: April 29, 2008              Respectfully submitted,


By: _____              By: _____
Joshua L. Raskin (JR-4603)                  Chad Johnson (CJ-3395)
Martin G. Raskin (MR-6884)                  Jai Chandrasekhar (JC-3789)
WOLFBLOCK LLP                               Adam Wierzbowski (AW-9755)
250 Park Avenue                             BERNSTEIN LITOWITZ BERGER &
New York, NY 10177                             GROSSMANN LLP
Phone: (212) 986-1116                       1285 Avenue of the Americas, 38th Floor
Fax: (212) 986-0604                         New York, NY 10019
                                            Phone: (212) 554-1400
                                            Fax: (212) 554-1444


**ATTORNEYS FOR PLAINTIFF ANVIK CORPORATION**